ROBERT E. REDMER, Appellant, v. BARBARY
COAST HOTEL & CASINO, Respondent.

No. 24434

April 7, 1994

872 P.2d 341

*Goodman & Chesnoff* and *Eckley M. Keach,* Las Vegas, for
Appellant.

*Dickerson, Dickerson, Lieberman & Consul,* Las Vegas, for
Respondent.

# OPINION

*Per Curiam:*

## FACTS

Respondent Barbary Coast Hotel & Casino ("Barbary Coast")
accepts off-track wagering on horse races run throughout the

country. The races are televised via satellite in the Barbary Coast Casino in Las Vegas. In conjunction with this betting, Barbary Coast conducts a type of wagering called the "Pick 6." Under the rules of this game, a player selects six possible winners in six different horse races run at a single track located somewhere outside Nevada.

Each Pick 6 wager costs $2.00. However, a player can increase the odds of winning by wagering more than $2.00 and selecting a variety of different winning combinations in the Pick 6 races. The Pick 6 written rules describe winners with the following pertinent language:

> In order to win, the player must pick the same or greater number of winning races as those officially posted as having won the greatest number of winning races at the designated track.

The workings of this language are illustrated by a simple example. Assume that Barbary Coast was accepting Pick 6 wagering on races conducted at the Santa Anita racetrack in California. If two persons at Santa Anita selected all six winners in the subject races, those persons at Barbary Coast equalling that feat would be entitled to a payoff amount.

In the event that there are no six-race winners at the track and a player at the Barbary Coast has selected winners in all six races, payoff amounts are calculated by a formula appearing in paragraph two of the Barbary Coast Pick 6 payoff rules. Paragraph two is the focus of this appeal and appears as follows:

> Payoffs will be the same as those at the track with the following exceptions:
> 1. Total payoffs on any one day will not exceed $500,000 in the aggregate.
> 2. In the event no one has selected six winners at the designated track, those players at the Barbary Coast who select six winners will receive 17½% *in the aggregate* of the total "Pick" 6 handle at the designated track after deducting the track percentage from the "Pick" 6 pool; those selecting five winners at the Barbary Coast will be paid one half of the amount paid to those selecting five winners at the track, with the *aggregate* amount not exceeding 17½% of the five winner payoff after the track has deducted their percentage from the "Pick" 6 pool. There will be no consolation payoff for picking four winners.

(Emphasis added.)

On March 19, 1989, Barbary Coast was accepting Pick 6 wagering on races taking place at the Santa Anita racetrack in

California. As an experienced and long-time professional gambler, appellant Robert E. Redmer ("Redmer") often played the Pick 6 at Barbary Coast. On this particular date, Redmer purchased several different Pick 6 tickets at a total cost of $2,560.00.

At the conclusion of the sixth race at Santa Anita, racing officials determined that there were no six-race winners at the track in California. As a result, no six-race payoff figure was ascertained or paid at the racetrack. In Las Vegas, however, Redmer had correctly selected winners in each Pick 6 race. In fact, Redmer had selected all six winners on five different tickets in his possession. He was the only individual at the Barbary Coast holding six-race winning tickets.

In addition, there were thirty-eight patrons at Santa Anita who had selected five of six winners in the Pick 6 races. Each of these consolation winning tickets paid $4,956.60 at the track. At the Barbary Coast, Redmer was the only player holding five-race winning tickets. He had seventy different five-race winning combinations.

Redmer presented his winning tickets for collection, and the dispute which is the subject of this appeal erupted. Redmer claimed that under paragraph two of the Pick 6 payoff rules, he was entitled to $448,165.00. Barbary Coast disagreed and calculated his winnings at $87,898.12.[1]

Before describing these competing calculations, it should be noted that the total amount of money wagered on Pick 6 racing at Santa Anita equalled $392,798.00 on March 19, 1989 (i.e., the "handle" under paragraph two). The Santa Anita track retention percentage for Pick 6 wagering was 20.08 percent. These figures are needed to make the proper calculations under paragraph two of the Pick 6 payoff rules.

Applying paragraph two, Redmer claimed that each of his six-race winning tickets paid 17½ percent of the Santa Anita total handle minus the 20.08 percent track retention percentage. In other words, each winning ticket paid 17½ percent of $313,924.16 or $54,936.73. By holding five such tickets, Redmer maintained that the casino owed him five times this $54,936.73 amount or $274,683.65.

With respect to his five-race winners, Redmer pointed out that each five-race winning ticket paid $4,956.60 at Santa Anita. Therefore, in accordance with the language appearing at the end of paragraph two, Barbary Coast had to pay each five-race winner in the casino one-half of the amount paid at Santa Anita or $2,478.30. Holding seventy winning combinations, Redmer

---

[1]Throughout this opinion, we utilize the figures that appear in the district court's decision.

claimed he was entitled to seventy times this $2,478.30 amount or $173,481.00.

On March 28, 1989, Redmer filed a player's dispute with the Nevada Gaming Control Board. An agent of the board investigated the matter by interviewing patrons of Barbary Coast, reading the Pick 6 rules, and consulting other enforcement agents. The investigating agent concluded that Redmer's calculations under paragraph two of the payoff rules were wrong. In short, Redmer had neglected the word "aggregate" appearing in this paragraph and limiting Barbary Coast's overall payoff exposure.

A two-day hearing was then held before an administrative hearing examiner. After listening to testimony and the parties' respective arguments, the examiner ruled in favor of Barbary Coast. In essence, he agreed with the agent's investigation. The "aggregate" phraseology in the rules limited Barbary Coast's overall payoff exposure. On October 11, 1990, the Nevada Gaming Control Board adopted the hearing examiner's recommendations in an official order.

Redmer petitioned for review in the district court. After a corresponding hearing, the court concurred in the hearing examiner and the Nevada Gaming Control Board's interpretation of the Pick 6 rules.

In sum, the investigating agent, the hearing examiner, the Nevada Gaming Control Board, and the district court all interpreted paragraph two of the payoff rules as follows: In accordance with the first half of paragraph two, six-race winners were entitled to "17½% in the aggregate of the total 'Pick' 6 handle at the designated track after deducting the track percentage." In other words, all six-race winners ("in the aggregate") would collectively receive 17½ percent of $313,924.16 (the Pick 6 handle of $392,798.00 minus the Santa Anita track deduction of 20.08 percent). This left a total six-race winner payout of $54,936.73. Redmer was the only player holding six-race winning tickets and was therefore entitled to the entire $54,936.73.

Similarly, Redmer's five-race consolation payout was limited by the words "aggregate amount not exceeding" appearing in the second half of paragraph two. Barbary Coast's entire five-race payout could not exceed "17½% of the five winner payoff" at the track. The total five-race winner payoff at Santa Anita was $188,350.80. Redmer was entitled to only 17½ percent of this amount or $32,961.39. This resulted in a total payout of $87,898.12.

Redmer appeals the district court's decision upholding the Nevada Gaming Control Board ruling. Specifically, Redmer claims that paragraph two of the Pick 6 rules is ambiguous and

should therefore be interpreted in his favor. We disagree and accordingly affirm the district court's decision.

## DISCUSSION

This court shows great deference to a Nevada Gaming Control Board decision on appeal. An order of the Nevada Gaming Control Board will not be disturbed unless it is arbitrary, capricious or contrary to the law. Nevada Gaming v. Consolidated Casinos, 94 Nev. 139, 575 P.2d 1337 (1978); *see also* NRS 463.3666. Yet in spite of this standard, this court is free to examine purely legal questions decided at the administrative level. Town of Eureka v. State Engineer, 108 Nev. 163, 826 P.2d 948 (1992).

The only viable issue presented by this appeal is whether the Nevada Gaming Control Board and the district court arbitrarily and capriciously interpreted paragraph two of the Pick 6 payoff rules. Redmer claims that the word "those" as used in paragraph two means *each*. Thus, he asserts that each of his winning combinations was entitled to a payoff equaling the percentages and rubric contained within paragraph two.

We cannot agree. Whether the word "those" means each player or all players is irrelevant to calculating Pick 6 winning payoff amounts. The key to calculating winning amounts rests upon the "aggregate" phraseology of the paragraph: "[Six-race w]inners will receive 17½% *in the aggregate* of the total 'Pick' 6 handle . . ." and five-race winners will receive a designated payoff figure, "with the *aggregate* amount not exceeding 17½% of the five winner payoff . . . ." (Emphasis added.)

Redmer glosses over this emphasized language in supporting his argument on appeal. "Aggregate" is defined by Webster's New Collegiate Dictionary as meaning "the whole sum or amount." Within this same definition, Webster's defines "in the aggregate" as "considered as a whole" or "[c]ollectively." *Webster's New Collegiate Dictionary* 64 (9th ed. 1985).

A careful reading of paragraph two, with this definition in mind, concludes that "aggregate" is used to limit Barbary Coast's total Pick 6 payoff exposure. For example, six-race winners are to "receive 17½% [collectively or considered as a whole] of the total 'Pick' 6 handle . . . ." The collective six-race winning payoff could not exceed 17½ percent of the total Pick 6 handle. Accordingly, the collective amount could not exceed 17½ percent of $313,924.16 or $54,936.73. Redmer was the only player holding six-race winners and was therefore entitled to the entire $54,936.73 sum.

We reach a similar conclusion with respect to the aggregate phraseology appearing in the second half of paragraph two of the payoff rules. The rules inform the player that five-race consolation winners will receive one-half of the five-race winning amount paid at the participating track, "with the *aggregate* amount not exceeding 17½% of the five winner payoff . . . ." This latter language is used to limit Barbary Coast's five-race winning payoff exposure.

Redmer claims that each five-race winning ticket is entitled to one-half of the track payoff amount as long as each *individual* amount does not exceed 17½ percent of the *total* five-race winning payoff at the track. Again, Redmer asks this court to neglect the limiting effect of the aggregate phraseology contained in the rules. It strains logic to imagine a scenario where half of an individual five-race winning ticket could exceed 17½ percent of the *total* five-winner payoff, thus necessitating an aggregate limitation. The aggregate limitation is tailored for situations such as this, where there are several five-race winning combinations at the Barbary Coast (Redmer had seventy) and the casino opts to limit its "aggregate" payoff exposure.

Accepting Redmer's interpretation of the rules would require this court to neglect the aggregate phraseology of paragraph two. We refuse to omit such imperative language of the contract. Watson v. Watson, 95 Nev. 495, 497, 596 P.2d 507, 508 (1979) (clear contract meaning will not be distorted by anything other than what is implied by the language used).

Although the language of the Pick 6 rules is not a model of draftsmanship clarity, it does effectively limit Barbary Coast's exposure to an aggregate percentage of the Pick 6 pool. This was the conclusion reached by the investigating gaming control agent, the hearing examiner, the Nevada Gaming Control Board, and the district court. Finding no flaw in this simple analysis, we conclude that the Nevada Gaming Control Board did not arbitrarily and capriciously interpret the contract language.

In light of the foregoing, and having duly considered all of Redmer's arguments on appeal, we affirm the district court's judgment upholding the Nevada Gaming Control Board's decision.

STEFFEN, YOUNG, SPRINGER and SHEARING, JJ., and ZENOFF, SR. J.,[2] concur.

---

[2]The Governor designated THE HONORABLE DAVID ZENOFF, Senior Justice, to sit in place of CHIEF JUSTICE ROBERT ROSE. Nev. Const. art. 6, § 4.