142 Nev., Advance Opinion 23

IN THE SUPREME COURT OF THE STATE OF NEVADA

STEVE FRIEDLANDER, AN
INDIVIDUAL,
Appellant,
vs.
TAMARACK JUNCTION RACE &
SPORTS BOOK, OPERATED BY
WILLIAM HILL RACE & SPORTS
BOOK WILLIAM HILL,
Respondent.

No. 89527

FILED

MAR 12 2026

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order denying a petition for judicial review of a Nevada Gaming Control Board decision. Second Judicial District Court, Washoe County; Lynne K. Jones, Judge.

*Affirmed.*

Dragon Law Group, PLLC, and Joseph A. Dragon, Las Vegas,
for Appellant.

McDonald Carano LLP and Adam Hosmer-Henner, A.G. Burnett, and Philip Mannelly, Reno,
for Respondent.

BEFORE THE SUPREME COURT, EN BANC.

*OPINION*

By the Court, STIGLICH, J.:

In resolving disputes, the terms of a gaming wager are construed according to an establishment's house rules, so long as patrons

have sufficient notice of those rules. Nev. Gaming Comm'n Reg. (NGCR) 22.150. In this case, appellant Steve Friedlander disputed the payout terms of two wagers he placed at a William Hill nonpari-mutuel sports book. Despite William Hill's house rules explicitly limiting odds on the wagers he placed, Friedlander maintained that he was entitled to full track odds payout. The Nevada Gaming Control Board determined that William Hill was justified in denying this payout because the signage at the sports book was sufficient to provide notice of the limited odds and, accordingly, those limited odds controlled. Friedlander petitioned the district court for judicial review, without success, and now appeals. Because we conclude that the Board's determination was supported by evidence and was not arbitrary, capricious, or otherwise contrary to the law, we affirm.

## FACTS AND PROCEDURAL HISTORY

Friedlander, an experienced sports bettor, orally placed three winning wagers on the 2019 Kentucky Derby at Tamarack Junction Race & Sports Book in Reno. Two of those wagers are at issue here.[1] One was a boxed exacta—selecting the first and second place horses, to finish in any order—consisting of 12 bets of $100, totaling $1,200. The other was a boxed trifecta—selecting the first, second, and third place horses, to finish in any order—consisting of 24 bets of $40, totaling $960.

William Hill operates the Tamarack Junction race book as a nonpari-mutuel betting location, meaning winning bets are paid not from the public collective betting pool, as with pari-mutuel betting, but from William Hill's own assets. Accordingly, William Hill limits odds on some of the wagers placed at the Tamarack Junction sports book. Pertinent to this

---

[1]Friedlander cashed out his third winning wager without issue.

case, William Hill caps nonpari-mutuel exacta wagers at 150-to-1 and trifecta wagers at 500-to-1.

At the time Friedlander placed his wagers, the Tamarack Junction sports book displayed several signs indicating these limited odds. Two signs read: "This William Hill Race and Sports Book is a non pari-mutuel location. Please refer to the William Hill House Rules and Regulations regarding pools available and payout odds limits. William Hill Customer Support (855-754-1200)." One of these signs was located on the counter where bets are placed. The other was displayed on the wall next to the betting sheets. The William Hill house rules referenced in those signs include the limited odds for exacta and trifecta wagers. These rules are available online. More notably, a printout of the "Non Pari-Mutuel Race Rules and Limits" page listing the exacta and trifecta odds limits was displayed on the counter where bets are placed. Relevant to Friedlander's bets, the Kentucky Derby betting sheets also listed the exacta and trifecta odds limits.

Friedlander did not use a betting sheet in placing his wagers and asserted that he did not see the signs disclosing the limited odds. While the ticket writers usually try to warn patrons that the odds are limited, particularly with large bets, Friedlander alleges he was not so notified. Rather, Friedlander asserts, he only learned of the odds limits when he tried to cash in his winning wagers. The full track odds for exacta wagers for the Kentucky Derby were 1,503.8-to-1, and for trifecta wagers, 11,475.3-to-1. William Hill's 150-to-1 and 500-to-1 respective limited odds reduced the total payout on the two wagers from $609,492 to $35,140.

When William Hill refused to pay the full track odds payout amount, Friedlander filed a complaint with the Board, urging it to order William Hill to pay the full track odds amount because he was not aware

that the odds were limited. After an investigation, a Board agent denied Friedlander's request, determining that the Tamarack Junction sports book had sufficient signage to indicate that it was a nonpari-mutuel betting location and that the exacta and trifecta odds were limited. Friedlander petitioned the Board for reconsideration. After a hearing, the Board affirmed the denial of payment, describing the signs at the Tamarack Junction sports book and concluding that they "were in conspicuous places and readily accessible by all patrons," providing "adequate notice" of the capped terms.

In coming to its determination, the Board referenced NGCR 22.150, which requires gaming establishments to "adopt, conspicuously display at its licensed premises, and adhere to written, comprehensive house rules governing wagering transactions with patrons." Because William Hill had conspicuously displayed the capped terms in compliance with NGCR 22.150, the Board reasoned, Friedlander knew or should have known about the limited odds and thus the limited odds determined the payout. With full track odds payout again denied, Friedlander then petitioned the district court for judicial review of the Board's determination. The district court denied the petition and affirmed the Board. Friedlander now appeals.

## DISCUSSION

With exceptions not relevant here, disputes over gaming payouts are within the exclusive jurisdiction of the Board to resolve. NRS 463.361(2)(a); *Sengel v. IGT*, 116 Nev. 565, 568-69, 2 P.3d 258, 260 (2000). A patron may not challenge a gaming payout with a breach of contract claim; instead, the matter must be referred to the Board. NRS 463.361(1); NRS 463.362(1). Upon receiving such a complaint, the Board assigns an agent to investigate the claim and determine whether the gaming debt

should be paid. NRS 463.362(3). If a patron is aggrieved by the Board agent's decision, they may petition for reconsideration by the Board, NRS 463.363, and subsequently for judicial review by a district court, NRS 463.3662(1). An appellate court may further review the decision, assuming the same role as that of the district court. NRS 463.3668; *Sengel*, 116 Nev. at 571, 2 P.3d at 262.

On appeal, board decisions receive deference. *Redmer v. Barbary Coast Hotel & Casino*, 110 Nev. 374, 378, 872 P.2d 341, 344 (1994). Reviewing courts may, however, remand or reverse the Board's decision if

> the substantial rights of the petitioner have been prejudiced because the decision is:
>
> (a) In violation of constitutional provisions;
>
> (b) In excess of the statutory authority or jurisdiction of the Board or the hearing examiner;
>
> (c) Made upon unlawful procedure;
>
> (d) Unsupported by any evidence; or
>
> (e) Arbitrary or capricious or otherwise not in accordance with law.

NRS 463.3666(3). Friedlander challenges the Board's determination under prongs (d) and (e), arguing that his substantial rights were prejudiced because the decision was unsupported by the evidence and was both arbitrary and capricious.[2] We disagree.

---

[2]Friedlander also argues that his constitutional "right to contract" was violated. Because he fails to provide any authority or argument beyond passing conclusory statements, we decline to address this argument. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (holding that this court need not consider claims that are not cogently argued or supported by relevant authority).

SUPREME COURT
OF
NEVADA

(O) 1947A

5

*The Board's determination is supported by the evidence*

First, Friedlander argues that no evidence supports the Board's finding that William Hill conspicuously displayed the limited odds at the Tamarack Junction sports book. He contends that the signage did not list the specific caps or the "actual amounts to be paid on the winning wagers." Instead, the signage "simply refers patrons to an unspecified external source," requiring "additional steps to learn a material term." With respect to the betting sheets, Friedlander argues they were "buried in clutter" and he was not directed to them. Finally, he argues he should have been orally notified about the caps when he placed his wagers.

As noted, one of the bases for reversing a Board decision is a lack of evidentiary support. NRS 463.3666(3)(d). The court will defer to the Board's decision, however, if there is *"any evidence whatsoever"* to support it, "even if that evidence is less than 'that which a reasonable mind might accept as adequate to support a conclusion.'" *Sengel*, 116 Nev. at 570, 2 P.3d at 261 (quoting *City of Las Vegas v. Laughlin*, 111 Nev. 557, 558, 893 P.2d 383, 384 (1995)).

The record before us includes evidence of the signage at the Tamarack Junction sports book, including pictures of its content and placement. Two signs specifically identified the Tamarack Junction sports book as a nonpari-mutuel location. Although a nonpari-mutuel designation does not necessarily indicate that odds are limited, at what ratio, or for which wagers, the signs indicated "payout odds limits" and referenced the William Hill house rules, which do identify the exacta and trifecta odds limits. One of those signs was on the counter of the betting station, accompanied by a printout of the house rules that explicitly displayed the exacta and trifecta odds limits. Those specific odds were also printed on the

SUPREME COURT
OF
NEVADA

(O) 1947A

Kentucky Derby betting sheets. All of these notices were posted in the betting area where they would be encountered by patrons.

Even without a warning from the ticket writers or using a betting sheet, three signs indicated odds were limited, two of which were posted on the counter where Friedlander placed his wagers. The Board found that the signs sufficiently notified Friedlander about the limited odds. We conclude that evidence in the record supports that determination and therefore defer to the Board's finding.

*The Board's decision was not arbitrary, capricious, or otherwise contrary to law*

Next, Friedlander argues that the Board's decision was arbitrary and capricious because it disregarded that his wagers were enforceable contracts and failed to apply settled principles of contract law. Because the signs were insufficient to establish the payout term of the gaming contract, Friedlander argues, he had a contract with William Hill that was silent as to the payout term. He argues that industry custom should supply the missing term and compel a full track odds payout and that William Hill needed to expressly indicate different terms to deviate from that custom. William Hill responds that Friedlander's contract-based arguments are irrelevant because Nevada does not impose contractual liability for gaming debts and that, in any case, the payout term was provided by the William Hill house rules.

As detailed, reversal of a Board decision is warranted if the decision is arbitrary, capricious, or contrary to law. NRS 463.3666(3)(e). In evaluating a challenge on this basis, we examine whether the Board's analysis is flawed. *Redmer*, 110 Nev. at 379, 872 P.2d at 345. A decision is arbitrary or capricious if it is "founded on prejudice or preference rather than on reason." *State v. Eighth Jud. Dist. Ct. (Armstrong)*, 127 Nev. 927, 931-32, 267 P.3d 777, 780 (2011) (quoting *Arbitrary, Black's Law Dictionary*

SUPREME COURT
OF
NEVADA

(O) 1947A

(9th ed. 2009)). It may also be considered arbitrary or capricious if it is "contrary to the evidence or established rules of law," *id.* at 932, 267 P.3d at 780 (quoting *Capricious, Black's Law Dictionary* (9th ed. 2009)), or if it fails to follow gaming regulations, *Nev. Gaming Comm'n v. Consol. Casinos Corp.*, 94 Nev. 139, 141, 575 P.2d 1337, 1338 (1978).

NRS 463.361(1) explicitly states that gaming debts absent a credit instrument are "void and unenforceable." The statute further provides that gaming debts "do not give rise to any administrative or civil cause of action" by patrons. Such clear statutory language dispatches Friedlander's argument that the Board's decision was arbitrary or capricious in failing to consider his wager an enforceable contract. While wagers are not enforceable by a patron through a claim for breach of contract, their terms necessarily remain subject to interpretation pursuant to contract law principles when the Board exercises its exclusive authority to resolve a patron's claim for the payment of a gaming debt.

By way of example, in *Redmer v. Barbary Coast Hotel & Casino*, we affirmed the Board's decision enforcing the plain language of the wager rules because, as a contract, the express terms therein controlled. 110 Nev. at 379, 872 P.2d at 345. In doing so, we referenced *Watson v. Watson*, 95 Nev. 495, 496-97, 596 P.2d 507, 508 (1979), which interpreted a property settlement agreement, for the proposition that courts cannot "distort the plain meaning of an agreement" under "the guise of interpretation." In a different case involving a malfunctioning slot machine, *Sengel v. IGT*, we interpreted the rules of play as a contract defined by the terms expressly stated on the face of the machine. 116 Nev. at 568, 571-72, 2 P.3d at 259, 262. Our precedent refutes William Hill's claim that contract law is inapplicable in evaluating Board decisions. A decision that wholly ignores relevant principles of contract law would be arbitrary or capricious.

As articulated in *Sengel*, expressly stated terms define the parameters of a contract, including a gaming wager. 116 Nev. at 572, 573, 2 P.3d at 262, 263. With respect to payout terms, the Board recognizes that an establishment's house rules define those terms. NGCR 22.150 (stating generally that the house rules govern wagering transactions with patrons); Nev. Gaming Control Bd., *Minimum Internal Control Standards: Race and Sports*, https://www.gaming.nv.gov/siteassets/content/divisions/audit/mics/v9-raceandsports.pdf (last accessed Mar. 3, 2026) (instructing auditors to ensure that payouts on nonpari-mutuel tickets "were made in accordance with the posted house rules"). NGCR 22.150 contemplates, however, that the house rules are conspicuously displayed such that patrons are put on notice of the terms of play. And under *Sengel*, displaying gaming terms on the face of a slot machine is sufficient to establish those terms as controlling. 116 Nev. at 572, 573, 2 P.3d at 262, 263.

Here, the Board found that the payout term of Friedlander's wagers was determined by the house rules, of which Friedlander had constructive knowledge due to the signage on site. Accordingly, the Board found that William Hill was justified in paying Friedlander the limited odds payout amount. Not only does this finding heed contract principles with respect to express contract terms, but it also recognizes that payout terms are established by house rules. The Board underpinned its decision with NGCR 22.150, focusing on how the house rules—specifically the limited odds—were displayed at the Tamarack Junction sports book. Based on the content, placement, and amount of signage, the Board found that the limited-odds term was conspicuously posted. As a result of that conspicuous display, the Board determined that that term governed Friedlander's wager, regardless of whether Friedlander actually knew about it. In making this decision, the Board considered the evidence, relevant contract

Supreme Court
of
Nevada

(O) 1947A

9

principles, and applicable gaming regulations. The decision is consistent with our precedent and does not exhibit a flaw in the Board's analytical reasoning. Therefore, we conclude that the Board's decision was not arbitrary, capricious, or otherwise contrary to law.

## CONCLUSION

We defer to the Board's resolution of gaming disputes unless a decision lacks any evidentiary support or exhibits arbitrary or capricious reasoning. In this case, the Board found that William Hill sufficiently displayed its limited-odds term via signage at its nonpari-mutuel Tamarack Junction sports book. It found that the signage effectively put Friedlander on notice that the odds for exacta and trifecta wagers were capped and that those limited odds thus controlled the payout term of his wagers. The Board's decision was supported by the evidence and was not arbitrary, capricious, or otherwise contrary to law. We therefore affirm the district court's judgment upholding the Board's decision.

_____, J.
Stiglich

We concur:

_____, C.J.
Herndon

_____, J.
Parraguirre

_____, J.
Cadish

_____, J.
Pickering

_____, J.
Bell

_____, J.
Lee

SUPREME COURT
OF
NEVADA

(O) 1947A

10